# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 94-CA-00645-SCT

*SINGING RIVER ELECTRIC POWER ASSOCIATION*

*v.*

*STATE OF MISSISSIPPI, THROUGH ITS AGENCY,*
*MS DEPT OF ENVIRONMENTAL QUALITY*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/13/94 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | PETER C. ABIDE |
| | JAMES N. COMPTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  JAMES M. HOOD, III |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES (OTHER THAN WORKER'S COMPENSATION) |
| DISPOSITION: | AFFIRMED - 4/24/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/15/97 |

**BEFORE DAN LEE, C.J., BANKS AND ROBERTS, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Singing River Electric Power Association sued to obtain the identities of various informants who told DEQ that Singing River was improperly disposing of regulated environmental waste. Singing River appeals from the chancery court's conclusion that it was not entitled to obtain the identities of DEQ's informants pursuant to a statutory privilege. We conclude that the lower court correctly found that the desired reports were exempt from disclosure under the Public Records Act, and therefore we affirm.

### I.

¶2. In 1981, employees of the Singing River Electric Power Association (hereinafter Singing River) buried several capacitors[1] on the grounds of the Singing River Mall in Gautier, Mississippi. Each capacitor contained between a pint and a quart of oil that was contaminated with polychlorinated

biphenyl (PCB), regulated substance that may not be freely released into the environment. Although the final rules governing the disposal of PCBs had not been enacted in 1981, burial was probably not a proper method of disposal at that time. In any event, the employees buried them because they could not figure out what else to do with them.

¶3. In 1983, the management at Singing River realized that the burial of the contaminated capacitors was improper, and subsequently dug them up and disposed of them at a new facility that was accepting that type of environmentally regulated waste.

¶4. In March, 1990, the Mississippi Department of Environmental Quality (hereinafter DEQ) was notified about the improper burial of the capacitors by an informant who had heard about it from an employee of Singing River. Soon thereafter, a representative of DEQ met with the informant and a former employee, who told him that not only had the waste been improperly disposed of, but that the documentation of that disposal had been falsified to indicate they had in fact been properly disposed of. The DEQ representative also met with the employee who had actually buried the capacitors, and another employee who had heard that a number of capacitors that he had ordered to be sent to an appropriate facility had instead been improperly buried.

¶5. Singing River found out that DEQ had been meeting with its employees very soon after those meetings occurred. The General Manager of Singing River subsequently met with DEQ, and was told that DEQ was considering bringing criminal charges against Singing River for the improper burial of the capacitors. Singing River agreed to a site assessment plan in which DEQ was to test the soil for contamination in the areas where the capacitors had been buried.

¶6. During this meeting, Singing River requested the names of the people who had told DEQ of the improper burial of the capacitors. DEQ did not disclose their informants, however they did promise to provide the general manager with the names at some point in the future. Not long after, DEQ informed Singing River that the informants' names would not be disclosed.

¶7. On June 12, 1990, Singing River formally requested a copy of the DEQ file on them through a letter submitted by their attorney. DEQ, through its director of the Bureau of Pollution Control, informed Singing River that while the investigation and clean-up were going well and would be concluded soon, Singing River's continued demand for the identities of the informants was going to prolong the resolution of the matter. Singing River interpreted this message to mean that they could probably learn the identities of the informants after the clean-up was completed. Singing River then promptly instructed its attorney to withdraw its request for the informants' identities. The clean-up was completed soon thereafter.

¶8. In December, 1992, Singing River again requested copies of the DEQ file pertaining to this investigation, including the identities of the informants. After receiving no response, Singing River repeated its request for the file in February of 1993, and sent a copy of its request to Attorney General Mike Moore. On March 23, 1993, DEQ replied that it would not release any informants' identities or any of the information obtained from the informants. DEQ did produce the rest of their file on Singing River. DEQ cited Miss. Code Ann. § 45-29-1, "Certain investigative and criminal justice records exempt from public access requirements," in support of its authority to withhold the information about the informants.

¶9. On November 29, 1993, Singing River filed a complaint under Miss. Code Ann. § 25-61-13, "Public Access to Public Records," seeking disclosure of the documents identifying the informants and the information that the informants gave to DEQ. In their complaint, Singing River alleged that their rights under the Confrontation Clause and other due process rights should supersede any confidentiality rights that DEQ might have in protecting its informants. Singing River reiterated these arguments in a Motion for In Camera Inspection and to Compel Disclosure that was filed on April 8, 1994, the day of the hearing on the matter.

¶10. In response, DEQ filed several motions in which it argued that: (1) the cause was barred by the general three-year statute of limitations; (2) the requested information was exempt from disclosure under the Public Records Act; (3) Singing River had failed to state a claim upon which relief can be granted; and (4) Singing River's Motion and Brief for In Camera Inspection ought to be stricken because it had not been filed five days before the hearing, in compliance with M.R.C.P. 6(d).

¶11. The chancery court heard argument on the motions on April 8, 1994. At the hearing, the court initially granted judgment in DEQ's favor on the pleadings, noting that Singing River had no right to the information under the Confrontation Clause because no criminal charges were pending. The court then immediately withdrew this ruling, and eventually allowed Singing River to put on its witnesses. At the close of the hearing, which included testimony from several of Singing River's witnesses, the chancery court recessed in order to allow DEQ to move for a directed verdict. It did so in a Motion for Directed Verdict, Motion to Dismiss or in the Alternative Motion for Judgment on the Pleadings that was filed on April 22, 1994. DEQ never put on its own case in response to Singing River, reserving that right in the event that their dispositive motions were denied.

¶12. On June 13, 1994, the chancery court granted the Defendant's Motion to Dismiss. The court noted in its order that the reports which contained the information that the Plaintiffs wanted to obtain was exempt from the Open Records Act pursuant to §§ 45-29-1 and 45-29-3. The court further found that the evidence offered by the Plaintiff was insufficient to establish their right to them.

¶13. Singing River immediately appealed this ruling to this Court, raising the following issues: (1) the chancery court erred in granting a directed verdict in favor of DEQ; (2) the trial court erred in finding that the reports containing the informants' identities were exempt from disclosure under § 45-29-1; (3) the chancery court erred in finding that the reports were exempt from disclosure under § 45-29-3; (4) Singing River's rights should take precedence over the informants' privacy rights, and (5) the chancery court erred in various evidentiary matters during the hearing.

## II.

### a.

¶14. Singing River first argues that the chancery court erred in granting a directed verdict against them because the evidence that was adduced at the hearing, along with all reasonable inferences which could be drawn therefrom, could have supported a verdict in their favor. Singing River argues that, instead of granting a verdict in DEQ's favor at the close of Singing River's evidence, the court should have required DEQ to put on proof that the report was exempt from disclosure.

¶15. In contrast to Singing River's implicit suggestion, the chancery court granted DEQ's motion to

dismiss, not its motion for directed verdict. In granting a motion to dismiss made under M.R.C.P. 41(b), a trial court should consider "the evidence fairly, as distinguished from in the light most favorable to the plaintiff," and the court should dismiss the case if it would find for the defendant. *Century 21 v. Corson*, 612 So. 2d 359, 369 (Miss. 1992). Thus, contrary to Singing River's assertion, this Court's review of the chancellor's decision to dismiss Singing River's claim is limited to ascertaining whether the record reveals substantial evidence to support the trial court's findings in support of its decision. *Id.*; *see also Croenne v. Irby*, 492 So. 2d 1291, 1292 (Miss. 1986).

¶16. The chancery court found that, as a matter of law, Singing River was not entitled to have access to the reports containing DEQ's informants' identities because they were exempt from the command of the Public Records Act. Miss. Code Ann. Section 45-29-1(1)(ii) provides that records in the possession of a public body that would reveal the identity of informants are exempt from the provisions of the Public Records Act.

¶17. Additionally, the chancery court found the reports were exempt from disclosure under Miss. Code Ann. § 45-29-3, which exempts records compiled for the purposes of criminal investigations which are in the possession of a public body that performs as one of its principal functions activities that pertain to criminal law enforcement, the apprehension of criminal offenders, or the investigation of criminal offenders or criminal activities. This exemption also includes in its scope the reports of informants and investigators.

¶18. Contrary to Singing River's present contention, there is ample evidence that supports the chancery court's findings in support of its dismissal of Singing River's complaint. The reports, which consist of three memoranda from DEQ's files, were provided to the chancery court for in camera inspection and have been provided to this Court under seal. They quite plainly reveal the identities of informants as described in § 45-29-1(1)(ii), and contain information that pertains to an investigation of potential criminal activity. Indeed, these facts are not disputed by either party. Thus, even if the reports were not initially compiled "for the purposes of a criminal investigation," so as to come within the exemption described in § 45-29-3, they are plainly exempt from disclosure by § 45-29-1(1)(ii) because they reveal the identity of informants. The chancery court's ruling is therefore correct, and Singing River's contrary assignment of error is without merit.

**b.**

¶19. Singing River next argues that the lower court erred in finding the report was exempt under Miss. Code Ann. § 45-29-1, because that section allows confidential reports to be released when the identity of any informants can be deleted from the desired documents. This is a blatant misstatement of that statute's provisions, which only provide that the identity of confidential informants may be deleted from documents when the confidentiality of such documents is being determined in a private hearing before a judge as provided for by Miss. Code Ann. § 25-61-13(2), "Courts may privately view the public records in controversy before reaching a decision on a suit filed to compel public access to records." The statute in no way provides for *public* access to documents that have had the identities of any informants deleted. Thus, the chancery court was within its authority in finding the desired reports to be exempt from disclosure to Singing River.

**III.**

**a.**

¶20. Singing River also argues that its rights under the Confrontation Clauses of the Sixth Amendment to the Constitution and Article III, Section 26 of the Mississippi Constitution mandate its access to the disputed records, in spite of their otherwise exempt status. They rely upon § 25-61-13(1), which instructs courts to consider any constitutional, common or statutory law in determining whether any documents are exempt from disclosure under the Public Records Act. Singing River argues that the chancellor's determination that the documents were exempt from disclosure failed to adequately account for their Confrontation Clause rights to examine the documents.

¶21. This argument is fatally flawed because Singing River had no Confrontation Clause rights that should have been factored into the chancery court's decision. Contrary to Singing River's assertion that they enjoy such rights because they were (and perhaps remain) the subject of an ongoing investigation of potentially criminal activity, the right of confrontation does not attach until the criminal prosecution has begun.[2] *See* 23 C.J.S. *Criminal Law* § 1117 (the right has been held inapplicable to various stages, such as investigation, preliminary hearings generally, bail hearing, etc.); *see also* **Balliet v. Whitmire**, 626 F.Supp. 219 (M.D. Penn. 1986) (Confrontation does not include investigatory stages). In this case, Singing River had not been the subject of any criminal, civil, or even administrative charges prior to filing its complaint. Thus, this argument is without merit.

**b.**

¶22. Singing River next argues that the chancery court's alternative ruling that the reports were also exempt from disclosure under § 45-29-3 (in addition to being exempt under § 45-29-1) was erroneous because that section exempts the investigative reports of those agencies whose *principal* functions include the enforcement of criminal laws. Singing River submits that DEQ's principle function is regulatory, and generally entails administrative penalties and fines, and therefore does not come within the exemption prescribed in this section. They note the testimony of DEQ Executive Director James Palmer, who stated that while criminal proceedings are available to DEQ, administrative fines and penalties are their "normal course of business."

¶23. This argument is moot since, as we have already concluded, the chancery court correctly ruled that the reports were exempt from disclosure under § 45-29-1. As such, we will not needlessly reach it.

**c.**

¶24. Singing River sets forth a final policy argument that its due process and Confrontation Clause rights should override the force of any confidentiality concerns that the exemption statutes are designed to address. Singing River asserts that it has no plans for retaliation against the informants, but would like to know the parties who have damaged their name and reputation "casually and cavalierly."[3] It argues that failing to order disclosure will give future informants "license to make further serious accusations, whether truthful or not."

¶25. Singing River attempts to draws an analogy of the equity of its request from two federal cases. In **Topuridze v. United States Information Agency**, 772 F.Supp. 662 (D.D.C. 1991), the United States District Court of the District of Columbia held that the Federal Privacy Act, 5 U.S.C. § 552,

required the United States Information Agency (USIA) to release a document which the Agency had withheld on the ground that disclosure would endanger the author's safety. The court expressly noted that since the party requesting the document was also the subject of the document, the Privacy Act mandated its release to him. Similarly, Singing River cites *Voelker v. Internal Revenue Service*, 646 F.2d 332 (8th Cir. 1981), in which the Eighth Circuit held that the Privacy Act required disclosure of all material in the requesting party's record, even materials that did not strictly pertain to that party.

¶26. Both of these cases do not, as Singing River argues, suggest any equitable or policy basis for DEQ's release of the memoranda containing informants' identities. First, both cases rely quite closely upon the text and legislative history of the Federal Privacy Act, rather than any non-statutory equity or policy. *Topuridze*, 772 F.Supp at 664-5 (noting that text and legislative history of Act grant the subject of documents in the government's possession a paramount right to their disclosure at his request); *Voelker*, 646 F.2d at 334 ("A review of the specific provisions of the Privacy Act supports the conclusion that access to records is a central feature of the Act").

¶27. Second, and perhaps most distinctive, none of the information that the courts ordered to be disclosed in those two cases came within the exemptions to disclosures under the Federal Privacy Act that are codified at 5 U.S.C. § § 552a(j) & (k). Indeed, like the Mississippi Public Records Act, these exemptions authorize an agency to withhold "certain investigatory materials the disclosure of which would reveal the identity of a confidential source." *Id.* On its face, this subsection appears to exempt from disclosure such records as those sought by Singing River in this case. Thus, Singing River's argument is not well grounded, particularly since it has established no constitutional right outside of the statutory prescription to view the DEQ file.

¶28. Finally, Singing River has not suggested any good policy basis for forcing the disclosure of the documents in spite of their express exemption. Contrary to Singing River's implication that informants ought *not* to be free to make allegations of environmental violations, the very purpose of the exemption is precisely to provide informants the license to safely assert their allegations, in order to nurture the free flow of information to DEQ about illegal activities such as Singing River's burial of PCBs. The fact remains that Singing River has admitted to committing at least some of the illegal activities described by DEQ's informants. To the extent that the informants alleged that Singing River conducted illegal activities that were not admitted, Singing River has shown no harm beyond its suggestion of vague damage to its reputation. Indeed, although DEQ received a lot of information about illegal activities from several informants, it has limited its punitive action to those allegations that proved true following their investigation.

¶29. Representatives of Singing River did testify at the hearing below that they would *like* to know the informants' identities because such knowledge may shed some light on either a hostile takeover attempt that targeted Singing River in 1988, or a shooting incident at one of their substation transformers in 1990 that caused 200-300 gallons of oil to leak onto the ground. Neither of these considerations is a good basis for disregarding the principles of the exemption statute. First, any hostile takeover attempt of Singing River is hardly DEQ's concern, and it is unreasonable to compel them to compromise their relationship with their informants in furtherance of Singing River's institutional curiosity. Secondly, the investigation of the shooting incident lies properly within the province of local law enforcement (such as the police and sheriff's departments, etc.), who if necessary can obtain the identities of DEQ's informants pursuant to § 45-29-1(2), which provides for

the free flow of information between public bodies for the purpose of achieving a coordinated investigation of unlawful activity. Thus, Singing River has established no good basis to compel DEQ to disclose the identities of its informants notwithstanding the statutory direction otherwise.

**d.**

¶30. Finally, Singing River argues that the chancery court made several erroneous evidentiary rulings during the hearing on April 8, 1994, that effectively prevented Singing River from presenting its case.

¶31. As we have previously concluded, the chancery court reached the correct result that Singing River was not legally entitled to the records under any circumstances. Therefore, we need not consider the substance of this assignment of error, since we would not reverse on this ground even if any of these evidentiary rulings were erroneous. *See **Century 21 Deep South Properties, Ltd. v. Keys,*** 652 So. 2d 707 (Miss. 1995) (assignments of error based on actions of the lower court will be disregarded where complaining party was not prejudiced by action of lower court); *see also **Melton Hardware Co. v. Heidelberg***, 91 Miss. 598, 44 So. 857(1907) (errors in instructions or otherwise are not grounds for reversal where no other result could have been reached below); ***Phillips v. Doe,*** 21 Miss. 31 (1849) (exclusion of evidence is not reversible if the verdict must have been the same even if it had been admitted and believed). Thus, this assignment of error is without merit.

## CONCLUSION

¶32. Since we have found no merit to any of Singing River's assertions of error, the judgment below is affirmed.

**¶33. AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**

1. A capacitor is a container about the size of a toaster. It has various electrical apparatuses on the inside and is designed to contain oil that may have been contaminated with chemicals that should not be released into the environment at large.

2. The right to confront has been extended to non-criminal proceedings. *See, e.g., **In Interest of C.B.,*** 574 So. 2d 1369 (Miss. 1990) (extending Confrontation Clause rights an accused parent in noncriminal cases of child abuse). Nevertheless, this Court has never held that the right is to be afforded to those who have not yet been accused in *any* type of legal proceeding.

3. Although Singing River presently urges this Court to consider the cavalier damage that DEQ's informants have caused to its reputation, we are mindful of the fact that Singing River has admitted that it behaved in the manner "cavalierly" alleged by those informants in improperly burying the contaminated capacitors.